**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

PHOENIX TECHNOLOGIES INTERNATIONAL, LLC; APG POLYTECH, LLC; and APG POLYTECH USA HOLDINGS, INC.,

Plaintiffs,

v.

UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as the United States Trade Representative*; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

Defendants.

Case No. 1:26-cv-00970

**COMPLAINT**

Plaintiffs Phoenix Technologies International, LLC, APG Polytech, LLC and APG Polytech USA Holdings, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this civil action against Defendants and allege as follows:

## INTRODUCTION

1. Plaintiffs commence this action to obtain relief in the form of a refund of import duties imposed pursuant to certain Executive Orders and paid by Plaintiffs, and an injunction against any further collection of said tariffs, should those tariffs be determined to be unauthorized.

2. Legal challenges to tariffs on goods originating from a range of countries are currently pending before the Supreme Court of the United States. *See Learning Res., Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sep. 9, 2025); *Trump v.*

*V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sep. 9, 2025). Lower courts have determined that these tariffs, imposed pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, were not authorized. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025); *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). However, the scope of available and appropriate relief in those challenges is in dispute. Indeed, while the Federal Circuit ruled on the merits that the tariffs are not authorized, it remanded the question of the appropriate injunctive relief to this Court. *See V.O.S. Selections*, 149 F.4th at 1339–40.

3. Accordingly, Plaintiffs bring this action to ensure that, in the event these tariffs are found to be unauthorized, it can obtain a judgment ordering the refund of duties that Plaintiffs paid and further ordering that these tariffs not be collected on any of Plaintiffs' imports in the future.

## JURISDICTION

4. In *V.O.S. Selections*, the Federal Circuit found that this Court has subject matter jurisdiction under 28 U.S.C. § 1581 for this action because it is commenced against an officer of the United States and arises out of an Executive Order providing for tariffs. 149 F.4th at 1328–30.

5. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

6. Plaintiff Phoenix Technologies International, LLC is an importer of record of merchandise subject to tariffs imposed pursuant to IEEPA challenged herein.

7. Plaintiff APG Polytech, LLC is an importer of record of merchandise subject to tariffs imposed pursuant to IEEPA challenged herein.

8. Plaintiff and APG Polytech USA Holdings, Inc. is an importer of record of merchandise subject to tariffs imposed pursuant to IEEPA challenged herein.

9. Defendant the United States of America is the federal government of the United States of America.

10. Defendant United States Customs and Border Protection is responsible for administering and collecting tariffs directed by the tariffs challenged herein.

11. Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He is responsible for implementing the tariffs challenged herein.

12. Defendant Rodney S. Scott, in his official capacity, is the Commissioner of United States Customs and Border Protection. He is responsible for administering and collecting the tariffs challenged herein.

13. Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative. He is responsible for implementing the tariffs challenged herein.

14. Defendant the Office of the United States Trade Representative ("USTR") is responsible for implementing the tariff policy challenged herein.

## STANDING

15. To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). Plaintiffs are harmed by the Executive Orders challenged herein because Plaintiffs have imported and continues to import goods subject to tariffs imposed by those Executive Orders and, therefore, has paid and would be required to continue paying these tariffs to the U.S. government. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the

plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). An order from this Court requiring refund of all duties paid regardless of liquidation status will redress these injuries by reversing the costs incurred by Plaintiffs' respective businesses. Declaratory and injunctive relief will further redress these injuries because Plaintiffs will no longer be required to pay the tariffs on future imports.

## BACKGROUND & FACTUAL ALLEGATIONS

### A. IEEPA Orders

16. On February 1, 2025, President Trump issued three executive orders imposing tariffs on imports from Canada, Mexico, and China. Each executive order was premised on IEEPA authorizing the tariffs, and for each set of tariffs President Trump claimed that they were justified under IEEPA because of a purported national emergency. Collectively, these are referred to in this complaint as the "Trafficking Tariff Orders."

17. The executive order directed at Mexico, Executive Order 14194, 90 Fed. Reg. 9117, *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"), imposed an additional 25% tariff on the import of goods from Mexico. The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.* at 9118.

18. The executive order directed at Canada, Executive Order 14193, 90 Fed. Reg. 9113, *Imposing Duties to Address the* Flow *of Illicit Drugs Across Our Northern Border* ("Canada Tariff

Order"), declared an emergency because of opioid trafficking and also imposed a 25% tariff, with certain exceptions.

19. Finally, the executive order directed at China, Executive Order 14195, 90 Fed. Reg. 9121, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"), also declared an emergency because of opioid trafficking, declaring that the "the sustained influx of synthetic opioids" was a national emergency and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce." The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.*

20. The China Tariff Order imposed an additional 10% *ad valorem* tariff on products from China imported into the United States on top of existing duties.

21. Four days later, on February 5, 2025, the President issued another order, Executive Order 14200, 90 Fed. Reg. 9277, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*. ("February 5 Amendment").

22. The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14228, 90 Fed. Reg. 11463, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("March 3 Amendment"). The March 3 Amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."

23. On April 2, 2025, the President issued an Executive Order imposing tariffs on goods originating in virtually all countries through Executive Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025), as amended ("Reciprocal Tariff Order"). The express stated goal of these tariffs is "to rebalance global trade flows." *Id.* at 15045.

24. The Reciprocal Tariff Order declares that the "large and persistent annual U.S. goods trade deficits" are a "national emergency" because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." *Id.* at 15041.

25. The Reciprocal Tariff Order finds that these trade deficits have "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.*

26. Based on this newly declared national emergency, the Reciprocal Tariff Order specifically imposes "an additional *ad valorem* duty" of 10 percent "on all imports from all trading partners" except for countries and products as expressly excluded. *Id.* at 15045. The Reciprocal Tariff Order also imposes a country-specific tariff rate on 57 trading partners. *Id.* at 15045, 15049-50. The Reciprocal Tariff Order modifies the Harmonized Tariff Schedule of the United States ("HTSUS") accordingly. *Id.* at 15047.

27. The 10 percent universal tariffs took effect on April 5, 2025. *Id.* at 15045, 15047.

28. These country-specific tariff rates were set to take effect on April 9, 2025. *Id.* at 15045.

29. On April 9, 2025, the President issued Executive Order No. 14266 suspending imposition of the country-specific rates until July 9, 2025. Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025). That order did not suspend the 10 percent universal tariffs, meaning that the 10 percent rate would apply during that period to goods originating in all the trading partners covered by the Reciprocal Tariffs. *Id.*

30. On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the Reciprocal Tariffs. *See* Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as amended* (Apr. 11, 2025).

31. On July 7, 2025, the President issued Executive Order No. 14316 extending the suspension of the country-specific rates until August 1, 2025. Exec. Order No. 14316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30823 (July 7, 2025).

32. On July 31, 2025, the President issued Executive Order No. 14326, which adjusted the country-specific rates and further extended their application until seven days after the order. Exec. Order No. 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37963, 37963–64 (July 31, 2025).

33. The Executive Orders discussed above are referred to collectively herein as the "Challenged Orders." The only asserted authority for imposing tariffs under the Challenged Orders is IEEPA. No other President has ever imposed tariffs under IEEPA. *See Learning Res.*, 784 F. Supp. 3d at 219.

**B. Plaintiffs' Importation Under the Challenged Orders**

34. Plaintiffs have imported, and continue to import, goods subject to tariffs imposed under the Challenged Orders.

35. These tariffs have caused Plaintiffs' respective businesses to suffer direct, cognizable financial harm as it has faced additional costs and will continue to do so unless and until the Challenged Orders are vacated.

**C. <u>Pending Legal Challenges to the Challenged Orders</u>**

36. Two cases, now consolidated, are pending before the Supreme Court of the United States challenging the President's authority to issue the Challenged Orders (and other tariff-related Executive Orders) under IEEPA and the Constitution. *See Learning Res., Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sep. 9, 2025); *Trump v. V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sep. 9, 2025). Oral argument was held on November 5, 2025.

37. In *Learning Resources*, educational toy companies brought suit in the District Court for the District of Columbia seeking a declaration that various tariff-related Executive Orders invoking IEEPA to impose tariffs were unlawful and to enjoin the enforcement of several tariff-related Executive Orders, including the Challenged Orders. 784 F. Supp. 3d 209 (D.D.C. 2025). On May 29, 2025, the District Court issued an order (1) declaring that the Executive Orders were unlawful; (2) declaring that the IEEPA did not authorize the President to impose the related tariffs; and (3) preliminarily enjoining the defendants from collecting the related tariffs from the plaintiffs. *See id.* at 233. The District Court order was appealed to the U.S. Court of Appeals for the D.C. Circuit, but the Supreme Court granted *certiorari* before judgment. *See* No. 24-1287, 2025 WL 2601021, at *1 (U.S. Sep. 9, 2025).

38. Likewise, in *V.O.S. Selections*, various companies and several states[1] brought suit in this court seeking a declaration that certain Executive Orders invoking IEEPA to impose tariffs, including the Challenged Orders, were unlawful and to enjoin the enforcement of the same. *See* 772 F. Supp. 3d 1350 (Ct. Int'l Tr. 2025). On May 28, 2025, the Court issued an order declaring that the Executive Orders were unlawful and issued a universal permanent injunction enjoining the operation of the Executive Orders. *See id.* at 1383–84. The Court's order was appealed to the U.S. Court of Appeals for the Federal Circuit. On August 29, 2025, the Federal Circuit, sitting *en banc*, held that the Executive Orders were unlawful, but vacated the universal injunction and remanded to this Court to determine the appropriate injunctive relief. 149 F.4th 1312 (Fed. Cir. 2025).[2]

39. The plaintiffs in *Learning Resources* and *V.O.S. Selections* advance three grounds under which the Executive Orders are unlawful. First, that IEEPA—the President's asserted authority for the Challenged Orders—does not encompass the power to tariff at all. Second, that IEEPA does not authorize these specific tariffs because there is no genuine national emergency. And third, that, if it does authorize these tariffs, IEEPA violates the nondelegation doctrine and is unconstitutional.

[1] The plaintiff-states are Oregon, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, and Vermont.

[2] The Federal Circuit held that the vacatur of the universal injunction was warranted based on the intervening decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). There the Supreme Court vacated a universal injunction preventing enforcement nationwide of the President's Executive Orders allegedly seeking to limit birthright citizenship. The majority held that the proper question for determining the scope of injunctive relief "is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to *the plaintiffs before the court*." *CASA, Inc.*, 606 U.S. at 852 (emphasis in original). Plaintiff's instant action arises, in part, from the concern that, even if the Challenged Orders are declared to be unlawful in *Learning Resources* and/or *V.O.S. Selections*, under *CASA* relief will be afforded to a group that omits Plaintiff. Moreover, if the Supreme Court determines that the Reciprocal Tariffs are unlawful, a separate lawsuit may be necessary to secure refunds in light of the Federal Circuit's remand on the scope of the injunction issued by this Court. A refund would be significant for Plaintiffs' respective business operations.

**i. The President's Limited Authority to Levy Tariffs and IEEPA**

40. The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 1, 3. "Tariffs are a tax, and the Framers of the Constitution expressly contemplated the exclusive grant of taxing power to the legislative branch[.]" *V.O.S. Selections*, 149 F.4th at 1322. Tariff-related delegations of congressional authority to the President have been either to impose tariffs in defined circumstances under Title 19 of the United States Code or to negotiate trade agreements subject to Congress's approval. In either form, the President's power is necessarily circumscribed by the Constitution and limits enacted by Congress.

41. Absent Congress's authorization, "the President [can] not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas." *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142–143 (D.C. Cir. 1974).

42. Through IEEPA, Congress granted the President authority to take specified emergency economic measures during a declared emergency.

43. IEEPA became law in 1977. Both the House and Senate committee reports "expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency" under a different statute—the Trading With the Enemy Act ("TWEA")—"by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency." Douglas A. Irwin, *Clashing Over Commerce: A History of U.S. Trade Policy*, at 7 n.51 (2017); H. Rep. No. 95-459 (1977); S. Rep. No. 95-466 (1977).

44. Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or

economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

45. Specifically, the President may (1) "investigate, regulate, or prohibit" transactions in foreign exchange, certain transfers of credits or payments, and the importing or exporting of certain currencies or securities;" and (2) "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign country or national has an interest; and (3) confiscate property of foreign persons, organizations, or countries that have "planned, authorized, aided, or engaged in . . . [armed] hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1).

46. IEEPA limits when the President may exercise these emergency powers, providing that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

**ii. IEEPA Does Not Encompass the Authority to Levy Tariffs**

47. The plain language of the IEEPA does not give the President authority to impose tariffs. IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts." *See V.O.S. Selections*, 149 F.4th at 1336. If Congress had intended to delegate to the President the broad power to levy tariffs under the IEEPA, it would have had to clearly say so. *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

48. While IEEPA gives the President the power to "regulate . . . [the] importation or exportation" of property, that provision does not encompass the power to tariff. The power to "regulate" is not the power to "tax." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201, 6 L.Ed. 23 (1824) (Marshall, C.J.) ("[T]he power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts."). In context, "regulate" is in a list of other verbs including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B). None of these verbs deal with the power to raise revenue or impose taxes. The distinction between regulation and taxation is underscored by the Securities Exchange Act of 1034 which directs the Securities and Exchange Commission ("SEC") to "regulate the trading of" securities—clearly Congress did not intend to grant the SEC the power to broadly tax trading activity.

49. When Congress has delegated the President the authority to levy duties or tariffs, it has established express procedural, substantive, and temporal limits on that authority. For example, Section 122 of the Trade Act of 1974—enacted just before the IEEPA—authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payment deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval. 19 U.S.C. § 2132. For an additional example, Section 301 of the Trade Act of 1974 authorizes an executive officer to impose duties on a foreign country that has been found, after notice and investigation,[3]

[3] Section 301 requires the USTR to initiate an investigation, consult with the foreign country regarding the practices being investigated, determine whether the requisite conditions for action have been met, publish its proposed action and the factual findings on which it is based, and allow for public regarding both the proposed investigation and the final action. *See* 19 U.S.C. §§ 2412-14.

to have committed unfair trade practices or violated trade agreements with the United States. 19 U.S.C. § 2411(c). Unlike these examples, IEEPA sets no such restrictions.

50. In sum, Congress has enacted a comprehensive scheme detailing when and how the President may impose tariffs under other statutes—"It would be anomalous for Congress to have painstakingly described the [President's] limited authority . . . but to have given him, just by implication," nearly unlimited tariffing authority under IEEPA. *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

51. Historical practice further demonstrates that IEEPA does not encompass the power to levy tariffs. In the five decades since IEEPA's passage, no President has invoked IEEPA or its predecessor, TWEA, to impose tariffs. IEEPA has, instead, been understood to authorize only targeted economic sanctions to address an underlying threat to U.S. national security.

52. The major questions doctrine further confirms that the IEEPA does not grant the authority to levy tariffs. *See V.O.S. Selections*, 149 F.4th at 1336–37. As explained by the Supreme Court, the doctrine applies in "cases in which the history and breadth of the authority asserted" by the government entails "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such circumstances, there may be a "reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 732 (cleaned up). These tariffs imposed by the Challenged Orders are of indisputable economic and political significance.

**iii. IEEPA Does Not Authorize the Challenged Orders**

53. Even if IEEPA permits the imposition of tariffs by the President in certain circumstances, those circumstances were not met here because the Challenged Orders (a) do not involve an "unusual or extraordinary threat" to the nation; (b) do not "deal with"—meaning reasonably relate—to the national emergency declared by the President; (c) have been employed to take on numerous, unrelated problems for which no national emergency has been declared in

the first place; and/or (d) are otherwise broader or outside the scope of the narrow delegated authority to impose tariffs. *See V.O.S. Selections*, 772 F. Supp. 3d at 1382–83.

54. The Challenged Orders do not concern any "emergency" or "unusual" or "extraordinary" threat.

55. The tariffs imposed also bear little relation to the purported national emergency. Even if the tariffs could address a trade deficit, the Challenged Orders impose tariffs on a wide swath of countries with different trade profiles vis-à-vis the United States, including some with which the United States runs a trade surplus or that do not charge any tariffs for American goods. Thus, the tariffs are simply not "reasonably related" to any asserted "emergency." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975) (holding that tariffs under the TWEA must be "reasonably related" to the emergency that the President declared).

**iv. Alternatively, IEEPA Is an Unconstitutional Delegation**

56. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

57. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States,* 488 U.S. 361, 371 (1989).

58. Accordingly, any grant of regulatory authority to the executive branch must be accompanied by an "intelligible principle" that will form the basis of executive action. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States,* 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States,* 321 U.S. 414, 426 (1944)).

59. Even if IEEPA did grant the President the authority to impose tariffs, it would constitute an unlawful delegation of legislative authority without the requisite intelligible governing principle. *See V.O.S. Selections*, 772 F. Supp. 3d at 1372. Interpreting IEEPA to provide authority for frequent and significant changes to the tariff schedule would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980); *see also Schecter Poultry*, 295 U.S. at 529 (holding that Congress "is not permitted to abdicate or transfer to other the essential legislative functions with which it is . . . vested").

60. If something as longstanding and benign as bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," then there is no genuine, intelligible principle in IEEPA upon which to assess the President's adherence to Congress's guidance.

61. The breadth of the tariff-imposition authority asserted under IEEPA—to impose tariffs at any rate on any country for any duration—counsels against reading IEEPA to confer such an extreme delegation of authority let alone one with intelligible guiding principles.

## CLAIMS FOR RELIEF

## COUNT I

## *ULTRA VIRES* ACTS IN VIOLATION OF THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, 50 U.S.C. § 1702

62. Plaintiffs reallege and incorporate herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

63. The Court has the ability to enjoin unconstitutional acts by state and federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citation omitted).

64. The Challenged Orders are *ultra vires* because, even in the face of an actual national emergency, IEEPA does not authorize the President to impose tariffs.

65. Alternatively, the Challenged Orders are *ultra vires* because bilateral trade deficits, do not constitute a genuine "emergency" or an "unusual" or "extraordinary" threat to national security, or the Challenged Orders are otherwise broader than the narrow delegation of tariff authority under IEEPA.

66. For these reasons (or for any other reason that the Supreme Court or a binding decision of another court of competent jurisdiction may find), the Court should declare that the Challenged Orders (including any future amendments thereto) are *ultra vires* because it exceeds the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

67. Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, it cannot be enforced by Defendants against Plaintiffs. To the extent that the Challenged Orders have not already been permanently enjoined by another court as to Plaintiffs, this Court should accordingly enjoin Defendants, in their official capacities, from enforcing the Challenged Orders (including any future amendments thereto) against Plaintiffs.

68. If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will continue to suffer substantial injury, including irreparable harm.

69. Plaintiffs are also entitled to an order directing Defendants to refund the tariffs paid including interest as a result of their imposition by the unlawful Challenged Orders, on all relevant entries whether liquidated or unliquidated.

## COUNT II

## VIOLATION OF ARTICLE I, § 1 OF THE U.S. CONSTITUTION

70. Plaintiffs reallege and incorporate herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

71. To the extent IEEPA could be interpreted to permit the President to impose the tariffs as set forth in the Challenged Orders, that grant of authority violates Article I of the Constitution and the nondelegation doctrine.

72. The authority to unilaterally impose and modify tariffs as asserted in the Challenged Orders would constitute an unconstitutional delegation of legislative authority to the executive branch, without—at a minimum—the requisite intelligible principle to cabin that authority.

73. For these reasons, to the extent that IEEPA delegates to the President the authority to impose the tariffs set forth in the Challenged Orders and to the extent that the Challenged Orders have not already been permanently enjoined by another court as to Plaintiffs, this Court should declare that IEEPA violates Article I, § 1 of the U.S. Constitution and is an unconstitutional delegation of legislative power.

74. Additionally, to the extent that IEEPA unconstitutionally delegates to the President the authority to impose the tariffs set forth in the Challenged Orders and to the extent that the Challenged Orders have not already been permanently enjoined by another Court as to Plaintiffs, this Court should enjoin Defendants, in their official capacities, from enforcing the Challenged Orders (including any future amendments thereto) against Plaintiffs.

75. If the Challenged Orders are not declared unlawful and enjoined, Plaintiffs will suffer substantial injury, including irreparable harm.

76. Plaintiffs are also entitled to an order directing Defendants to refund the tariffs paid as a result of their imposition by the Challenged Orders, on all relevant entries whether liquidated or unliquidated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

a. declaring that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

b. declaring that the Challenged Orders are unlawful;

c. declaring that, if IEEPA grants the President the authority to impose the tariffs in the Challenged Orders, it constitutes an unconstitutional delegation of legislative power;

d. awarding Plaintiffs, and ordering Defendants to promptly provide, a refund of the amount of any tariffs collected by Defendants pursuant to the Challenged Orders, including pre- and post-judgment interest, on all relevant entries whether liquidated or unliquidated;

e. enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect any current or future tariffs from Plaintiffs announced in the Challenged Orders (including any future amendments thereto); and

f. grant any such other relief as this Court may deem just or proper.

Dated: February 10, 2026

Respectfully submitted,

**FAEGRE DRINKER BIDDLE & REATH LLP**
Attorneys for Plaintiffs

Wm. Randolph Rucker
320 S. Canal Street, Suite 3300
Chicago, IL 60606
(312) 569-1157

Daniel R. Wilson
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 230-5211

By: *<u>/s/ Wm. Randolph Rucker</u>*

**CERTIFICATE OF SERVICE**

Pursuant to U.S. Court of International Trade Rule 4(b) and (h), I hereby certify that on February 10, 2026, I served a copy of the Summons, Complaint, Form 5, Form 11, and Form 13 by certified mail, return receipt requested, upon the following:

Attorney-In-Charge
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
26 Federal Plaza
New York, NY 10278

Attorney-In-Charge
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

Attorney-In-Charge
Office of Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229

Howard Lutnick
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

Rodney Scott
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, NW
Washington, DC 20229

Jamieson Greer
Office of the United States Trade Representative
600 17th Street, NW
Washington, DC 20508

Attorney-In-Charge
Office of General Counsel
Office of the United States Trade Representative
600 17th Street NW
Washington, DC 20508

*/s/ Wm. Randolph Rucker*